James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: 702.214.2100
Facsimile: 702.214.2101

Shea R. Haass, Esq. *(Pro Hac Vice forthcoming)*
shea.haass@nortonrosefulbright.com
Robert L. Greeson, Esq. *(Pro Hac Vice forthcoming)*
robert.greeson@nortonrosefulbright.com
Philip A. Tarpley, Esq. *(Pro Hac Vice forthcoming)*
philip.tarpley@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

Attorneys for Plaintiffs ARB Labs Inc.
and ARB Labs USA Inc.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ARB LABS INC.; ARB LABS USA INC., <br><br> Plaintiffs, <br><br> v. <br><br> JUSTIN WOODARD, <br><br> Defendant. | CASE NO.: <br><br> **PLAINTIFF ARB LABS INC. AND ARB LABS USA INC.'S ORIGINAL COMPLAINT** |

Plaintiffs ARB Labs Inc. and ARB Labs USA Inc. (collectively, "ARB Labs" or "Plaintiffs") file this Original Complaint against Defendant Justin Woodard ("Woodard" or "Defendant"), and would respectfully show the Court as follows:

## I.

## JURISDICTION AND VENUE

1.  The Court has federal question jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the Federal Defend Trade Secrets Act (18 U.S.C. § 1836), the Federal Electronic Communications Privacy Act (18 U.S.C. §§ 2701, 2707), and the Federal Computer Fraud and Abuse Act (18 U.S.C. § 1030).

1

2. The Court has supplemental jurisdiction over Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims in the suit within the Court's original jurisdiction that they are part of the same case or controversy.

3. The Court has personal jurisdiction over Woodard because he is a citizen and resident of the State of Nevada and regularly conducts business in Nevada.

4. Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims occurred in the judicial district for the United States District Court for the District of Nevada.

5. Jurisdiction and venue are also proper pursuant to Section 14 of the Employment Agreement between Woodard and ARB Labs USA Inc., which provides that "[a]ny action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in the state of Nevada, county of Clark. The parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue."[1]

## II.

## CASE SUMMARY

6. This action arises from Woodard's misappropriation of confidential and proprietary information and/or trade secrets from Plaintiffs ARB Labs Inc. and ARB Labs USA Inc. As a result of such wrongful and unlawful conduct, Plaintiffs seek injunctive relief prohibiting the access, use, destruction, and dissemination of the confidential and proprietary information and trade secrets, civil seizure of their property containing such confidential and proprietary information and trade secrets, and monetary damages as may be appropriate.

---

[1] Employment agreement between Justin Woodard and ARB Labs USA Inc., Sep. 27, 2016 (the "Employment Agreement"), attached hereto as Exhibit A, at p. 13, § 14.1.

2

## III.

## PARTIES

7. Plaintiff ARB Labs Inc. is a foreign corporation formed under the laws of the Province of Ontario, Canada. ARB Labs Inc.'s principal place of business is located at 63 Berkeley Street, Toronto, ON M5A 2W5.

8. Plaintiff ARB Labs USA Inc. is a corporation formed under the laws of the State of Delaware. ARB Labs USA Inc.'s principal place of business is located at 4035 East Post Road, Las Vegas, NV 89120.

9. Woodard is an individual residing in or around Clark County, Nevada. Woodard may be served with process at 280 Willow Grove Circle, Henderson, Nevada 89014, or wherever he may be found.

## IV.

## STATEMENT OF FACTS

**A. The Parties**

10. ARB Labs operates in a highly competitive and technologically-driven area of the table game industry – bet recognition. ARB Labs is a market leader offering casino operators worldwide with the most technologically advanced table bet recognition and hand count system. ARB Labs' state-of-the-art and proprietary bet recognition technology generates slot-like analytics with standard betting chips used in popular table games such as Blackjack and Baccarat. The advanced analytics delivered by ARB Labs' technology give casino operators real-time and accurate results regarding player wagers and dealer performance that assist table game operators and casino marketing professionals in improving their player reinvestment strategies and dealer scheduling and evaluation.

11. Woodard was hired by ARB Labs USA Inc. as its Chief Executive Officer ("CEO") and appointed as ARB Labs Inc.'s CEO on September 27, 2016. As an executive, Woodard had full access to non-public, confidential, and proprietary information and trade secrets of ARB Labs. Woodard voluntarily resigned from ARB Labs effective September 28, 2018.

PISANELLI BICE
400 SOUTH 7TH STREET, SUITE 300
LAS VEGAS, NEVADA 89101

**B.     Woodard's Employment Agreement**

12.     At the time Woodard was hired, on or about September 27, 2016, Woodard signed an Employment Agreement with ARB Labs USA Inc.  In light of Woodard's access to ARB Labs' non-public, confidential, and proprietary information and trade secrets, the Employment Agreement contains numerous provisions directed at protecting and maintaining the secrecy of ARB Labs' valuable technology.

**1.     Woodard's Confidentiality Obligations**

13.     Section 6 of the Employment Agreement contains an extensive and binding confidentiality provision (the "Confidentiality Provision").

14.     As part of that Confidentiality Provision, Woodard agreed that he "understands and acknowledges that during the Employment Term, he will have access to and learn about Confidential Information of the Company [ARB Labs USA Inc.], ALI [ARB Labs Inc.] and their respective affiliates." Employment Agreement, Ex. A, at p. 8, § 6.

15.     The Confidentiality Provision defines "Confidential Information" as follows:

> For purposes of this Agreement, '**Confidential Information**' includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form of medium, relating directly or indirectly to: **business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques**, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, **know-how, trade secrets, computer programs, computer software applications, operating systems, software design, hardware design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material,** supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, **design information**, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, **developments, reports**, internal controls, security procedures, **graphics, drawings, sketches**, market studies, sales information, revenue, costs, **formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions,** unpublished patent applications, **original works of authorship, discoveries, experimental processes, experimental results, specifications,** customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company or its business or any existing or prospective

customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

Employment Agreement, Ex. A, at p. 8, § 6.1(a) (emphasis added).

16. The Confidentiality Provision also extended the definition of Confidential Information to include:

. . . .other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. . . . [and] includes information developed by him in the course of his employment with the Company as if the Company furnished the same Confidential Information to the Executive in the first instance.

Employment Agreement, Ex. A, at p. 9, § 6.1(a).

17. With regard to the Confidential Information described above, Woodard agreed and covenanted:

(i) to treat all Confidential Information as strictly confidential.

(ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Company, except as required in the performance of the Executive's [Woodard's] authorized employment duties to the Company or with the prior consent of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

Employment Agreement, Ex. A, at p. 9, § 6.1(b) ("Disclosure and Use Restrictions").

18. Section 6.1(b) specifically provides that "the Executive understands and agrees that the Confidential Information is and shall at all times remain the property of the Company and/or ALI." Employment Agreement, Ex. A, at p. 10, § 6.1(b).

## 2. Woodard's Intellectual Property Obligations

19. Section 10 of the Employment Agreement provides Woodard's obligations relating to ARB Labs' intellectual property (the "Intellectual Property Provision"). Employment Agreement, Ex. A, at p. 11, § 10.

20. As part of the Intellectual Property Provision, Woodard agreed that he "understands, acknowledges and agrees that Intellectual Property is exclusively owned by the Company." Employment Agreement, Ex. A, at p. 11, § 10.

21. The Employment Agreement defines "Intellectual Property" as:

(a) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and re-examinations relating thereto;

(b) trademarks, service marks, trade dress, logos, designs, trade names, brand names and corporate names, and all goodwill associated therewith, together with all translations, adaptations, derivations, and combinations, applications, registrations, and renewals relating thereto, together with all rights under licenses, registered user agreements, technology transfer agreements and other agreements or instruments relating to any of the foregoing;

(c) copyrightable works, all copyrights, and all applications, registrations, and renewals relating thereto;

(d) mask works and all applications, registrations, and renewals in connection therewith;

**(e) trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals);**

**(f) computer software (including all data and related documentation);**

(g) advertising and promotional materials;

6

(h) other proprietary rights, domain names, e-mail addresses, telephone numbers, social medial identifications and tags;

(i) engineering procedures and other industrial property and designs (including applications for any of these), environmental technology and biotechnology, integrated circuit topographies; and

**(j) copies and tangible embodiments of the foregoing (in whatever form or medium) and any registrations and applications for registration of any of the foregoing.**

Employment Agreement, Ex. A, at pp. 11-12, §§ 10(a)-(j) (emphasis added).

22. With regard to that Intellectual Property, the Employment Agreement provides:

> The Executive understands, acknowledges and agrees all of the work product or deliverables produced or developed by the Executive during the course of the Executive's employment with the Company, either alone or in conjunction with others, including, without limitation, all Intellectual Property, all technology of any nature whatsoever, all notes, records, drawings, designs, inventions, improvements, developments, discoveries, trade secrets, and patentable or copyrightable material which relate, directly or indirectly, to the Company, including any derivative works of any of the foregoing, **is the sole and exclusive property of the Company.**

Employment Agreement, Ex. A, at p. 12, § 10 (emphasis added).

### 3. <u>Woodard's Non-Compete Obligations</u>

23. The Employment Agreement also contains a Non-Competition provision (the "Non-Compete Provision"). Employment Agreement, Ex. A, at p. 10, § 8.

24. The Non-Compete Provision states that:

> At all times during the Employment Term and **the Restricted Period**,[2] the **Executive shall not**, directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor or otherwise), **engage in any Competitive Activity**, or have any direct or indirect interest in any Person that directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor, or otherwise) engages in a Competitive Activity. . . .

Employment Agreement, Ex. A, at p. 10, § 8 (emphasis added).

---

[2] The Employment Agreement defines the "Restricted Period" as the twelve months after the Employment Term. *See* Employment Agreement, Ex. A, at p. 10, § 7 ("During the Employment Term and for twelve months thereafter (the 'Restricted Period')").

7

25. The Employment Agreement narrowly defines "Competitive Activity" as follows:

> . . . .any business that competes with the business of ARB as conducted or as proposed to be conducted at the relevant time; provided that the parties hereto acknowledge and agree that, for the purposes of determining the business of ARB during the Restricted Period, such business is comprises solely of the development and commercial exploitation of bet recognition and gesture-based monitoring and analytics systems utilizing unique software technology, including casino asset management analytic and monitoring systems (which is the business as of the Effective Date).

Employment Agreement, Ex. A, at p. 11, § 8.1.

### 4. Woodard's Obligations To Return Company Property

26. The Employment Agreement contains a provision relating to the return of company property (the "Return of Company Property Provision"). Employment Agreement, Ex. A, at p. 12, § 12.

27. That Return of Company Property Provision states that:

> Upon (a) voluntary or involuntary termination of the Executive's employment or (b) the Company's request at any time during the Executive's employment, the Executive shall
>
> (i) **provide or return to the Company** any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, **computers, cell phones, smartphones, equipment, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion**, including but not limited to those that constitute or contain any Confidential Information or Intellectual Property, that are in the possession or control of the Executive, whether they were provided to the Executive by the Company or any of its business associates or created by the Executive in connection with his employment by the Company; and
>
> (ii) **delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company devices, networks, storage locations and media in the Executive's possession or control.**

Employment Agreement, Ex. A, at pp. 12-13, § 12 (emphasis added).

**5.     Woodard's Contractual Obligations Survive His Resignation**

28.     With regard to the timing and continued existence of Woodard's confidentiality obligations, the Employment Agreement provides that:

> The Executive understands and acknowledges that his obligations under this Agreement with regard to any particular Confidential Information shall commence **immediately** upon the Executive first having access to such Confidential Information . . . and shall continue **during** and **after** his employment by the Company until such time as such Confidential Information has become public knowledge other than as a result of the Executive's breach of this Agreement or breach by those acting in concert with the Executive or on the Executive's behalf.

Employment Agreement, Ex. A, at p. 9, § 6.1(b) (emphasis added).

29.     The Employment Agreement also contains a survival provision. That provision states that "[u]pon expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement." Employment Agreement, Ex. A, at p. 15, § 22.

**6.     Injunctive Relief Available Against Woodard**

30.     The Employment Agreement contains a remedies provision (the "Remedies Provision"). *See* Employment Agreement, Ex. A, at p. 12, § 11.

31.     As relevant to this dispute, that Remedies Provision states that, "[i]n the event of a breach or threatened breach" by Woodard of the Confidentiality, Intellectual Property, or Non-Compete Provisions:

> The Executive hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

Employment Agreement, Ex. A, at p. 12, § 11.

32.     The Employment Agreement also provides that: "The parties mutually agree that the [Employment] Agreement can be specifically enforced in court and can be cited as evidence

9

in legal proceedings alleging breach of the [Employment] Agreement." Employment Agreement, Ex. A, at p. 13, § 15.

**C.   ChipVue and ARB Labs' Non-Public, Confidential, and Proprietary Trade Secrets**

33.   ARB Labs is the creator and owner of "ChipVue," a 3D optical bet recognition solution for casinos and locations that offer gaming opportunities to their customers. ARB Labs' ChipVue technology relies on confidential and proprietary hardware installed in strategic locations on the gaming table. The system activates when the hand count sensor recognizes the start of a new hand being played and optically detects each round of play, the value of each player's bet, and the conclusion of each session.

34.   ChipVue's immense value lies not just in its physical hardware but also its software and ability to track, compile, and analyze – in real-time – a high volume of data from the gaming table. With ChipVue, casinos and other gaming locations are able to securely access, track, and monitor in real-time the value of the bets wagered per player, per table, per hand, the player's average wager, the number of hands per hour, dealer efficiency, and other valuable gaming metrics and trends. Access to this extensive information permits casinos and other gaming locations to optimize the operation and profitability of their table-game business to a degree previously unavailable to the gaming industry.

35.   ARB Labs' non-public, confidential, and proprietary trade secrets relating to ChipVue, include, without limitation, the designs of the hardware components (camera angles, illumination, and fit), the process by which ARB Labs "learns" a casino table, the software flow relating to supervised learning, and a custom machine learning algorithm which contains a lengthy list of proprietary sequences and approaches to mathematical transformations which turn the data gathered by ChipVue's cameras and sensors into learnable and scalable data (collectively, "Trade Secrets").

36.   On information and belief, no other companies in the bet recognition industry have developed the technology, hardware, and software at the high level of sophistication and market readiness as ARB Labs. As a result, the non-public, confidential, and proprietary trade secrets

related to ChipVue give ARB Labs a competitive advantage in the bet recognition area of the gaming market.

37. ARB Labs is highly protective of its confidential and proprietary information and trade secrets. ARB Labs has instituted internal policies and processes by which any dissemination of non-public, confidential and proprietary trade secrets requires approval and is limited, monitored, tracked and closely managed. ARB Labs has a policy requiring every employee that is permitted access to ARB Labs' confidential and proprietary information and trade secrets – like Woodard – to sign agreements that protect such confidential information and trade secrets from unauthorized use or disclosure. In addition, in the limited circumstances where manufacturers and third-party contractors are engaged by ARB Labs, ARB Labs has an internal policy that requires such third parties to sign binding non-disclosure agreements.

### D. Woodard Misappropriates ARB Labs' Trade Secrets

#### 1. Woodard threatens to compete with ARB Labs

38. In January 2019, ARB Labs received a letter from Woodard demanding that ARB Labs release Woodard from his obligations in the Employment Agreement, including Woodard's key obligations in the Confidentiality, Intellectual Property, Return of Company Property, and Non-Compete Provisions that protect ARB Labs' confidential and proprietary information and trade secrets from falling into the hands of ARB Labs' competitors.[3]

39. Specifically, Woodard included with his letter a draft "Confidential Mutual Release and Non-Disparagement Agreement," which, among other things, would require ARB Labs to:

> **unconditionally release[] and forever discharge[] Woodard . . . from any and all claims** (including but not limited to, claims for attorneys' fees), demands, losses, damages, agreements, actions, liens, promises, foreseen and unforeseen matters, or causes of action (known or unknown) which **ARB Labs now has or may later discover or which may hereafter exist, in connection with or arising directly or indirectly out of or in any way related to any and all agreements and matters related to Woodard's employment** and compensation at ARB Labs (including, but not

---

[3] *See* Letter from Justin Woodard to ARB Labs, Jan. 15, 2019 (the "Jan. 15 Letter"), attached hereto as Exhibit B.

11

limited to, payroll disputes, **employment agreements, non-compete agreements**, non-solicitation agreements, leases, indemnity agreements, option agreements, and vesting agreements).[4]

40. In addition to the release Woodard demanded, Woodard's letter also states: "As I begin to explore future opportunities, it is probable that I will remain in the gaming sector and function in an executive capacity. . . ." Jan. 15 Letter, Ex. B.

41. Woodard's January 2019 letter followed-up a December 13, 2018 letter sent by his then-counsel falsely asserting that "ARB Labs [had] **already** released Mr. Woodard from his duties under the [Employment] [A]greement."[5]

42. Woodard's stated intention to pursue employment in the gaming sector coupled with repeated demands for a release and claim that he is no longer bound by the Confidentiality, Intellectual Property, Return of Company Property, and Non-Compete Provisions in the Employment Agreement puts ARB Labs' confidential and proprietary information at grave and immediate risk of unauthorized use and disclosure.

### 2. Investigation of Woodard's Activities in Relation to ARB Labs' Trade Secrets

43. In the face of Woodard's threats, in December 2018, ARB Labs conducted an audit of Woodard's activities and any continuing access to ARB Labs' confidential and proprietary information and trade secrets. In connection with this audit, ARB Labs discovered that Woodard remains in possession of the Microsoft Surface Pro computer purchased by ARB Labs USA Inc. and used by Woodard during his employment at ARB Labs (the "Laptop"). This Laptop is the property of ARB Labs USA Inc. and contains highly confidential and proprietary information and trade secrets of ARB Labs.

44. ARB Labs also discovered, among other things, that Woodard had accessed ARB Labs' e-mail server and used his ARB Labs e-mail account after the date of his resignation. Woodard did not have authorization from ARB Labs to access the ARB Labs' e-mail server or

---

[4] *See* Ex. B at pp. 2-6.

[5] *See* Letter from Kurt R. Bonds to Marvin Singer, December 13, 2018 (the "Dec. 13 Letter"), attached hereto as Exhibit C.

12

use his ARB Labs e-mail account or the Laptop after the effective date of his resignation. Moreover, Woodard is obligated under his Employment Agreement to return the Laptop and any confidential and proprietary information and trade secrets to ARB Labs.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836

45. ARB Labs re-alleges and incorporates by reference the allegations set forth above.

46. As set forth above, through the course of its business ARB Labs has developed, compiled and maintained a substantial amount of non-public, confidential and proprietary information and trade secrets, including (without limitation) information relating to its ARB Labs' bet recognition hardware and software. Such information is highly confidential and proprietary, and ARB Labs goes to great lengths to protect such confidential and proprietary information and data. The Employment Agreement obligates current and former ARB Labs employees, including Woodard, not to use or otherwise disclose any secret or confidential and proprietary information or data of ARB Labs.

47. As an executive of ARB Labs, Woodard had access to ARB Labs' highly confidential and proprietary information and/or trade secrets.

48. Woodard has misappropriated ARB Labs' highly confidential and proprietary information and/or trade secrets, which he acquired through his confidential relationship with ARB Labs. Woodard's misappropriation of ARB Labs' highly confidential and proprietary information and/or trade secrets was for the purpose of obtaining substantial business and competitive advantage for himself to the detriment of ARB Labs.

49. ARB Labs has and continues to take reasonable and necessary steps to ensure the confidentiality and security of its highly confidential and proprietary information and/or trade secrets. ARB Labs' highly confidential and proprietary information and/or trade secrets is not generally known to the public.

50. ARB Labs has suffered damages as a result of Woodard's misappropriation and/or unauthorized use and/or disclosure of ARB Labs' highly confidential and proprietary information and/or trade secrets in an amount to be determined at trial.

51. In addition, ARB Labs is entitled to civil seizure and injunctive relief to prevent Woodard from further use and/or disclosure of ARB Labs' highly confidential and proprietary information and/or trade secrets.

## SECOND CAUSE OF ACTION

**Violation of the Federal Electronic Communications Privacy Act – Stored Electronic Communications, 18 U.S.C. §§ 2701, 2707**

52. ARB Labs re-alleges and incorporates by reference the allegations set forth above.

53. By accessing ARB Labs' e-mail server and transmitting e-mails from an ARB Labs e-mail account after his resignation, Woodard violated federal law by intentionally accessing and obtaining communications stored on a facility through which an electronic communication service is provided.

54. Woodard accessed and obtained such stored electronic communications without ARB Labs' knowledge, authorization or consent.

55. By accessing and obtaining such stored communications, Woodard has caused ARB Labs to suffer economic losses. ARB Labs is entitled to monetary damages as compensation for the economic harms directly and proximately caused by Woodard's violations of 18 U.S.C. § 2701.

56. Because Woodard accessed these stored communications willfully and intentionally, ARB Labs is additionally entitled to punitive damages and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

**Violation of the Federal Computer Fraud and Abuse Act – Unauthorized Access to a Protected Computer, 18 U.S.C. § 1030(a)(2)**

57. ARB Labs re-alleges and incorporates by reference the allegations set forth above.

14

58.     ARB Labs' e-mail server is protected computers because they are connected to the internet and are used in or affect interstate commerce.

59.     By intentionally accessing ARB Labs' e-mail server and transmitting e-mails from an ARB Labs e-mail account after his resignation, Woodard violated federal law by intentionally accessing a protected computer without authorization and obtaining information therefrom.

60.     By virtue of this unauthorized access and misappropriation, Woodard has caused ARB Labs to suffer economic losses that, upon information and belief, aggregate in excess of the $5,000 threshold requirement. The investigation and response into Woodard's actions is ongoing, and items of substantial expense – such as a forensic analysis of the Laptop upon its return – have yet to occur. Thus, ARB Labs will lose more than $5,000 in a one-year period.

61.     ARB Labs is entitled to compensatory damages for the economic losses directly and proximately caused by Woodard's violations of 18 U.S.C. § 1030.

## FOURTH CAUSE OF ACTION

**Misappropriation and Disclosure of Confidential/Proprietary Information in Violation of Nevada's Uniform Trade Secrets Act, Nev. Rev. Stat. Chapter 600A**

62.     ARB Labs re-alleges and incorporates by reference the allegations set forth above.

63.     As set forth above, through the course of its business ARB Labs has developed, compiled and maintained a substantial amount of non-public, confidential and proprietary information and trade secrets, including (without limitation) information relating to its ARB Labs' bet recognition hardware and software. Such information is highly confidential and proprietary, and ARB Labs goes to great lengths to protect such confidential and proprietary information and data. The Employment Agreement obligates current and former ARB Labs employees, including Woodard, not to use or otherwise disclose any secret or confidential and proprietary information or data of ARB Labs.

64.     As an executive of ARB Labs, Woodard had access to ARB Labs' highly confidential and proprietary information and/or trade secrets.

65.     Woodard has misappropriated ARB Labs' highly confidential and proprietary information and/or trade secrets, which he acquired through his confidential relationship with

15

ARB Labs. Woodard's misappropriation of ARB Labs' highly confidential and proprietary information and/or trade secrets was for the purpose of obtaining substantial business and competitive advantage for himself to the detriment of ARB Labs.

66. ARB Labs has and continues to take reasonable and necessary steps to ensure the confidentiality and security of its highly confidential and proprietary information and/or trade secrets. ARB Labs' highly confidential and proprietary information and/or trade secrets is not generally known to the public.

67. ARB Labs has suffered damages as a result of Woodard's misappropriation and/or unauthorized use and/or disclosure of ARB Labs' highly confidential and proprietary information and/or trade secrets in an amount to be determined at trial.

68. In addition, ARB Labs is entitled to injunctive relief to prevent Woodard from further use and/or disclosure of ARB Labs' highly confidential and proprietary information and/or trade secrets, as set forth above.

## FIFTH CAUSE OF ACTION

### Breach of Contract

69. ARB Labs re-alleges and incorporates by reference the allegations set forth above.

70. The Employment Agreement obligates Woodard not to use, disclose or disseminate confidential and proprietary information and trade secrets of ARB Labs in a way that is not related to ARB Labs' business activities during his employment or retain or use such information after his employment, or remove or make copies of any such information without prior management approval. By his conduct, Woodard has violated the following terms of his Employment Agreement:

    a. Confidentiality Provision;

    b. Intellectual Property Provision;

    c. Return of Company Property Provision;

71. Woodard's failure to comply with those provisions constitutes a material breach of the Employment Agreement.

72. All conditions precedent to ARB Labs' right to enforce the Employment Agreement have been performed, have occurred, or have been waived.

73. Woodard's breaches of the Employment Agreement have caused damage to ARB Labs in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### Conversion

74. ARB Labs re-alleges and incorporates by reference the allegations set forth above.

75. Woodard knowingly and willfully misappropriated valuable, confidential business information, documents, and hardware belonging to ARB Labs, including but not limited to the Laptop that he failed to return to ARB Labs and the confidential and proprietary information and trade secrets on the Laptop.

76. Woodard failed to return the property of ARB Labs upon the termination of his employment. This failure resulted in Woodard's continued possession of and misuse of such property and information.

77. Upon information and belief, Woodard has wrongfully exercised dominion or control over ARB Labs' property.

78. By these actions, Woodard has directly and proximately caused economic harm to ARB Labs. Woodard is liable to ARB Labs in monetary damages for tortious conversion.

### SEVENTH CAUSE OF ACTION

### Attorneys' Fees

79. ARB Labs re-alleges and incorporates by reference the allegations set forth above.

80. Woodard's misappropriation of ARB Labs' trade secrets was willful and malicious and therefore ARB Labs seeks an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and Nev. Rev. Stat. § 600A.060(3).

81. If applicable at the termination of this matter, ARB Labs also requests an award of attorneys' fees pursuant to Nev. Rev. Stat. § 18.010(2)(a).

## VI.

## **PRAYER AND REQUEST FOR RELIEF**

For these reasons, ARB Labs respectfully prays that the following relief be granted. ARB Labs specifically requests that the Court issue a summons commanding Woodard to appear and answer the claims and allegations brought against him, and:

(a) Issue an order to seize the Laptop and issue a temporary restraining order to restrain and enjoin Woodard in this matter until a motion for preliminary injunction can be heard, as described in Plaintiffs' Emergency Motion for *Ex Parte* Temporary Restraining Order, Civil Seizure, Expedited Discovery, and Preliminary Injunction, filed contemporaneously with this Complaint;

(b) Set a hearing on a preliminary injunction at the earliest opportunity and, during the pendency of this action, restrain and enjoin Woodard as set forth in Plaintiffs' Emergency Motion for *Ex Parte* Temporary Restraining Order, Civil Seizure, Expedited Discovery, and Preliminary Injunction, filed contemporaneously with this Complaint;

(c) Following a trial on the merits, enter a permanent injunction:

  (i) Commanding the return to ARB Labs' of all confidential and proprietary information and/or Trade Secrets of ARB Labs' and any copies of ARB Labs' confidential and proprietary information and/or Trade Secrets;

  (ii) Restraining and enjoining Woodard, his agents and all persons in active concert or participation from accessing, using, disclosing, or disseminating any non-public, confidential, and proprietary Trade Secrets which Woodard learned, acquired or developed during his employment with ARB Labs. Such information includes, without limitation, the non-public, confidential, and proprietary Trade Secrets relating to ARB Labs' ChipVue product that contain any information derived from, misappropriated, or taken from ARB Labs;

  (iii) Restraining and enjoining Woodard, his agents and all persons in active concert or participation with him from accessing, using, disclosing, or disseminating any information relating to ARB Labs' ChipVue product;

  (iv) Restraining and enjoining Woodard, his agents and all persons in active concert or participation with him from in any way using or placing themselves in a position where they probably or inevitably will use, disclose or disseminate any information relating to ARB Labs' ChipVue product and any of the confidential and proprietary information and/or trade secrets of ARB Labs;

  (v) Restraining and enjoining Woodard from directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor or otherwise) engaging in any Competitive Activity for the twelve months following his resignation from ARB Labs effective September 28, 2018, or having any direct or indirect interest in any Person that directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board

member, security holder, creditor or otherwise) engages in a Competitive Activity; provided that the foregoing shall not apply to the acquisition by Woodard, solely as an investment of securities of any issuer that is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, and that are listed or admitted for trading on any United States national securities exchange or that are quoted on the Nasdaq Stock Market, or any similar system or automated dissemination of quotations of securities prices in common use, so long as Woodard does not control, acquire a controlling interest in or become a member of a group which exercises direct or indirect control of more than three percent (3%) of any class of capital stock of such corporation. "Person" is collectively defined as a firm, company, corporation, partnership, association, venture, business, person, or entity. "Competitive Activity" is defined as any business that competes with the business of ARB Labs USA, Inc. or ARB Labs, Inc. as conducted or as proposed to be conducted at the relevant time; provided that the business of ARB Labs USA Inc. or ARB Labs Inc. is deemed to be solely the development and commercial exploitation of bet recognition and gesture-based monitoring and analytics systems utilizing unique software technology, including casino asset management analytic and monitoring systems;

(vi) Commanding Woodard, his agents and all persons in active concert with him: (i) to treat all Confidential Information, as that term is defined in his Employment Agreement, as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of ARB Labs) not having a need to know and authority to know and use the Confidential Information in connection with the business of ARB Labs and, in any event, not to anyone outside of the direct employ of ARB Labs except with the prior consent of ARB Labs in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of ARB Labs, except with the prior consent of ARB Labs in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and

(vii) Commanding Woodard, his agents and all persons in active concert with him: (i) to provide or return to ARB Labs any and all property belonging to it, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, equipment, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, and data and all documents and materials belonging to the ARB Labs and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Intellectual Property, as those terms are defined in Woodard's Employment Agreement, that are in the possession or control of Woodard, his agents and all persons in active concert with him, whether they were provided to Woodard by ARB Labs or any of its business associates or created by Woodard, his agents and all persons in active concert with him, in connection with Woodard's

employment with ARB Labs; and (ii) to delete or destroy all copies of any such documents and materials not returned to ARB Labs at the time of Woodard's resignation that remain in the possession or control of Woodard, his agents and all persons in active concert with him, including those stored on any non-ARB-Labs devices, networks, storage locations and media in the possession or control of Woodard, his agents and all persons in active concert with him.

(d) For actual damages, together with prejudgment and post-judgment interest against Woodard;

(e) An award of attorneys' fees, costs, and expenses as provided for in: (1) Nev. Rev. Stat. § 18.010; (2) 18 USC § 1836(b)(3)(D); (3) Nev. Rev. Stat. § 600A.060(3); (4) NEV. REV. STAT. § 18.020; and/or (5) as otherwise permitted by applicable law against Woodard;

(f) An award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C); and

(g) For such other and further relief, at law or in equity, as the Court may deem just and proper.

DATED this 21st day of January, 2019.

**PISANELLI BICE PLLC**

By: */s/ James J. Pisanelli*
James J. Pisanelli, Esq., Bar No. 4027
400 South 7th Street, Suite 300
Las Vegas, NV 89101

**NORTON ROSE FULBRIGHT US LLP**

Shea R. Haass *(Pro Hac Vice forthcoming)*
Robert L. Greeson *(Pro Hac Vice forthcoming)*
Philip A. Tarpley *(Pro Hac Vice forthcoming)*
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932

**Attorneys for Plaintiffs ARB Labs Inc.
and ARB Labs USA Inc.**