James J. Pisanelli, Esq., Bar No. 4027
JJP@pisanellibice.com
Debra L. Spinelli, Esq., Bar No. 9695
DLS@pisanellibice.com
M. Magali Mercera, Esq., Bar No. 11742
MMM@pisanellibice.com
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: 702.214.2100
Facsimile: 702.214.2101

Shea R. Haass, Esq. *(Pro Hac Vice Admitted)*
shea.haass@nortonrosefulbright.com
Robert L. Greeson, Esq. *(Pro Hac Vice Admitted)*
robert.greeson@nortonrosefulbright.com
Philip A. Tarpley, Esq. *(Pro Hac Vice Admitted)*
philip.tarpley@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

Attorneys for Plaintiffs ARB Labs Inc.
and ARB Labs USA Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| ARB LABS INC.; ARB LABS USA INC., <br><br>*Plaintiffs*, <br><br>v. <br><br>JUSTIN WOODARD, <br><br>*Defendant*. | CASE NO.: 2:19-cv-00116 <br><br>**STIPULATION AND ORDER FOR PRELIMINARY INJUNCTION** <br><br>ECF Nos. 2, 36 |

Plaintiffs ARB Labs Inc. and ARB Labs USA Inc. (jointly, ARB Labs" or "Plaintiffs") and Defendant Justin Woodard ("Woodard" or "Defendant," and together with ARB Labs, the "Parties") hereby stipulate to the following findings of fact and conclusions of law and agree to this Court's entry of a preliminary injunction as set forth in this Stipulation and Order for Preliminary Injunction, as follows:

1. The Court has subject matter jurisdiction over this dispute pursuant to ARB Labs' federal claims pursuant to 28 U.S.C. § 1331, the Federal Defend Trade Secrets Act (18 U.S.C. §

1836), the Federal Electronic Communications Privacy Act (18 U.S.C. §§ 2701, 2707), and the Federal Computer Fraud and Abuse Act (18 U.S.C. § 1030). The Court has supplemental jurisdiction over ARB Labs' pendent state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims in the suit within the Court's original jurisdiction that they are part of the same case or controversy. The Court has personal jurisdiction over Woodard because he is a citizen and resident of the State of Nevada and regularly conducts business in Nevada.

2. Venue for this action is proper pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims occurred in the judicial district for the United States District Court for the District of Nevada. Jurisdiction and venue are also proper pursuant to Section 14 of the Employment Agreement between Woodard and ARB Labs USA Inc., which provides that "[a]ny action or proceeding by either of the parties to enforce this Agreement shall be brought only in a state or federal court located in the state of Nevada, county of Clark. The parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue."

3. All substantive and procedural prerequisites to entry of this Agreed Preliminary Injunction, as well as its enforceability under and/or compliance with the Federal Rules of Civil Procedure, including Rule 65(d) of the Federal Rules of Civil Procedure, have been met and/or are hereby waived by the Parties.

4. Effective September 27, 2016, ARB Labs USA Inc. hired Defendant Justin Woodard ("Woodard") as its Chief Executive Officer ("CEO"). ARB Labs Inc. also appointed Woodard as its CEO effective September 27, 2016. As CEO of ARB Labs, Woodard had access to the non-public, confidential, and proprietary trade secrets of both ARB Labs Inc. and ARB Labs USA Inc.

5. On or about September 27, 2016, Woodard signed an Employment Agreement with ARB Labs USA Inc. (the "Employment Agreement"). The Employment Agreement, among other things, contains the following provisions:

a. Section 6 <u>Confidential Information</u>. The Executive understands and acknowledges that during the Employment Term, he will have access to and learn about Confidential Information of the Company, ALI and their respective affiliates.

b. Section 6.1 <u>Confidential Information Defined</u>. (a) <u>Definition</u>. For purposes of this Agreement, **"Confidential Information"** includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, hardware design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company or its business or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company in confidence. The Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. The Executive understands and agrees that Confidential Information includes information developed by him in the course of his employment by the Company as if the Company furnished the same Confidential Information to the Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Executive; provided that, such disclosure is through no direct or indirect fault of the Executive or person(s) acting on the Executive's behalf. (b) <u>Disclosure and Use Restrictions</u>. The Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made

available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Company, except as required in the performance of the Executive's authorized employment duties to the Company or with the prior consent of the Company in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order and provided that the Executive shall promptly provide written notice to the Company of such proposed or actual disclosure and the Executive takes into account the reasonable requests of the Company in relation to the content of such notice. The Executive understands and acknowledges that his obligation under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Executive first having access to such Confidential Information (whether before or after be begins employment by the Company) and shall continue during and after his employment by the Company until such time as such Confidential Information has become public knowledge other than as a result of the Executive's breach of this Agreement or breach by those acting in concert with the Executive or on the Executive's behalf. The Executive understands and agrees that the Confidential Information is and shall at all times remain the property of the Company and/or ALI.

c. Section 8 <u>Non-Competition</u>. At all times during the Employment Term and Restricted Period, the Executive shall not, directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor, or otherwise), engage in any Competitive Activity, or have any direct or indirect interest in any Person that directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor, or otherwise) engages in Competitive Activity; provided that the foregoing shall not apply to the acquisition by the Executive, solely as an investment of securities of any issuer that is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, and that are listed or admitted for trading on any United States national securities exchange or

74173500.2

that are quoted on the Nasdaq Stock Market, or any similar system or automated dissemination of quotations of securities prices in common use, so long as the Executive does not control, acquire a controlling interest in or become a member of a group which exercises direct or indirect control of, more than three percent (3%) of any class of capital stock of such corporation.

    d.    Section 8.1 <u>Definition of Competitive Activity</u>. For the purposes of this Agreement, "Competitive Activity" shall mean any business that competes with the business of ARB as conducted or as proposed to be conducted at the relevant time; provided that the parties hereto acknowledge and agree that, for the purpose of determining the business of ARB during the Restricted Period, such business is comprised solely of the development and commercial exploitation of bet recognition and gesture-based monitoring and analytics systems utilizing unique software technology, including casino asset management analytic and monitoring systems (which is the business as of the Effective Date).

    e.    Section 10 <u>Intellectual Property</u>. The Executive understands, acknowledges and agrees that Intellectual Property is exclusively owned by the Company. For the purposes of this Agreement, "Intellectual Property" means any or all of the following and all common law and statutory rights in, arising out of, or associated therewith: (a) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and re-examinations relating thereto; (b) trademarks, service marks, trade dress, logos, designs, trade names, brand names and corporate names, and all goodwill associated therewith, together with all translations, adaptations, derivations, and combinations, applications, registrations, and renewals relating thereto, together with all rights under licenses, registered user agreements, technology transfer agreements and other agreements or instruments relating to any of the foregoing; (c) copyrightable works, all copyrights, and all applications, registrations, and renewals relating thereto; (d) mask works and all applications, registrations, renewals in connection therewith; (e) trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) computer software (including all data and related documentation); (g) advertising and promotional materials; (h) other proprietary rights, domain names, email addresses, telephone numbers, social media identifications and tags; (i) engineering procedures and other industrial property and designs (including applications for any of these), environmental technology and biotechnology, integrated circuit topographics; and (j) copies and tangible embodiments of the foregoing (in whatever form or medium) and any registrations and applications for

registration of any of the foregoing. The Executive understands, acknowledges and agrees all of the work product or deliverables produced or developed by the Executive during the course of the Executive's employment with the Company, either alone or in conjunction with others, including, without limitation, all Intellectual Property, all technology of any nature whatsoever, all notes, records, drawings, designs, inventions, improvements, developments, discoveries, trade secrets, and patentable or copyrightable material which relate, directly or indirectly, to the Company, including any derivative works of any of the foregoing, is the sole and exclusive property of the Company.

f.  Section 11 <u>Remedies</u>. In the event of a breach or threatened breach by the Executive of Section 6, 7, 8, 9, or 10 of this Agreement, the Executive hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

g.  Section 12 <u>Return of Company Property</u>. Upon (a) voluntary or involuntary termination of the Executive's employment or (b) the Company's request at any time during the Executive's employment, the Executive shall (i) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, employer credit cards, network access devices, computers, cell phones, smartphones, equipment, manuals, reports, files, books, compilations, work product, e-mail messages, recordings, tapes, disks, thumb drives or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Intellectual Property, that are in the possession or control of the Executive, whether they were provided to the Executive by the Company or any of its business associates or created by the Executive in connection with his employment by the Company; and (ii) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Executive's possession or control, including those stored on any non-Company devices, networks, storage locations and media in the Executive's possession or control.

h.  As used herein, the term "Executive" shall mean Justin Woodard.

i.  As used herein, the term "Company" shall mean ARB Labs USA Inc.

j.  As used herein, the term "Employment Term" shall mean the period during which the Executive is employed by the Company.

k. As used herein, the term "ALI" shall mean ARB Labs Inc.

l. As used herein, the term "Restricted Period" shall mean September 28, 2018 and for twelve months thereafter.

m. As used herein, the term "Person" shall mean any firm, company, corporation, partnership, association, venture, business, person or entity.

n. As used herein, the term "Effective Date" shall mean September 27, 2016.

6. Woodard voluntarily resigned his position as CEO of ARB Labs USA Inc. effective September 28, 2018. After his resignation, the relationship of the Parties became acrimonious. Woodard accused ARB Labs of breaching his employment agreement and threatened to sue if ARB Labs did not sign a mutual release. The release requested by Woodard and his counsel sought a release of all claims under the Employment Agreement, including claims under Sections 6, 8, 10 and 12 of the Employment Agreement. On January 15, 2019, Woodard sent an email to ARB Labs stating, in part, "I am writing you today requesting that you sign off on the release that my attorney forwarded on 12/13/18. With the arrival of the New Year/Q1, I am going to start pursuing employment opportunities and would like to memorialize our separation in the form of the attached agreement." ARB Labs investigated Woodard and found that he had not returned a Microsoft Surface Pro laptop that was used by Woodard for business purposes during his employment with ARB Labs, including business purposes related to ARB Labs' ChipVue product and associated information (the "Laptop"). The Laptop was purchased on Woodard's personal credit card and reimbursed in full by ARB Labs.

7. ARB Labs operates in the bet recognition area of the table game industry. ARB Labs is the creator and owner of "ChipVue," a proprietary 3D optical bet recognition solution for casinos and other locations that offer table gaming opportunities. ARB Labs' ChipVue technology relies on non-public, confidential, proprietary, and trade secret software and hardware systems.

8. ARB Labs' non-public, confidential, proprietary, and trade secret software and hardware systems related to ChipVue are, without limitation, the designs of the hardware components (camera angles, illumination, and fit), the process by which ChipVue "learns" a casino table, the software flow related to supervised learning, and a custom machine learning

algorithm which contains a lengthy list of proprietary sequences and approaches to mathematical transformations which turn the data gathered by ChipVue's cameras and sensors into learnable and scalable data.

9. ARB Labs derives competitive advantage and economic value from its non-public, confidential, proprietary, and trade secret software and hardware systems related to ChipVue. ARB Labs has <u>invested</u> time and resources developing its non-public, confidential, proprietary, and trade secret software and hardware systems related to ChipVue, and limits access to that information and requires employees to sign confidentiality agreements to protect that information from unauthorized use, disclosure, or dissemination.

10. Any use, disclosure, or dissemination of ARB Labs' non-public, confidential, proprietary, and trade secret software and hardware systems related to ChipVue, by Woodard, his agents and all persons in active concert or participation with him will cause immediate and irreparable injury and harm to ARB Labs.

11. Accordingly, the Court **HEREBY ORDERS**[1] as follows:

   a. Justin Woodard, his agents and all persons in active concert or participation with him who receive actual notice of this order, whether acting directly or indirectly, are **RESTRAINED AND ENJOINED** from taking any action on ARB Labs' ChipVue product and associated information, including but not limited to destroying, copying, acquiring, disclosing, or using that product or information; and

   b. Justin Woodard, his agents and all persons in active concert or participation with him who receive actual notice of this order, whether acting directly or indirectly, are **RESTRAINED and ENJOINED** from destroying, copying, acquiring, disclosing, or using the Laptop and all of the data and information that resides on the Laptop; and

   c. Justin Woodard is **RESTRAINED AND ENJOINED** during the Restricted Period from, directly or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor or otherwise), engaging in any Competitive Activity, or having any direct or indirect interest in any Person that directly

---

[1] The Parties agree that this Stipulated Preliminary Injunction shall become effective no later than 5:00 p.m. on March 11, 2019, the time at which the temporary restraining order in the Stipulation of the Parties filed on February 15, 2019 [ECF No. 26] expires, regardless of when the Court enters this Stipulation and Order for Preliminary Injunction.

or indirectly (whether as a principal, agent, partner, employee, officer, investor, owner, consultant, board member, security holder, creditor, or otherwise) engages in a Competitive Activity; provided that the foregoing shall not apply to the acquisition by Woodard, solely as an investment, of securities of any issuer that is registered under Section 12(b) or 12(g) of the Securities Exchange Act of 1934, and that are listed or admitted for trading on any United States national securities exchange or that are quoted on the Nasdaq Stock Market, or any similar system or automated dissemination of quotations of securities prices in common use, so long as Woodard does not control, acquire a controlling interest in or become a member of a group which exercises direct or indirect control of, more than three percent (3%) of any class of capital stock of such corporation. The term "Competitive Activity" shall mean any business that competes with the business of ARB Labs as conducted or as proposed to be conducted at the relevant time; provided that the parties hereto acknowledge and agree that, for the purposes of determining the business of ARB Labs during the Restricted Period, such business is comprised solely of the development and commercial exploitation of bet recognition and gesture-based monitoring and analytics systems utilizing unique software technology, including casino asset management analytic and monitoring systems (which is the business as of the Effective Date). The term "Person" shall mean any firm, company, corporation, partnership, association, venture, business, person or entity. The term "Effective Date" shall mean September 27, 2016. The term "Restricted Period" shall mean September 28, 2018 and for twelve months thereafter; and

12. **IT IS FURTHER ORDERED** that, unless otherwise noted herein, the terms of this Order shall remain in force until:

   a. A final trial on the merits is held and final judgment is rendered; or

   b. The Order is dissolved by agreement of the Parties, by the Court, or by operation of law.

13. **IT IS FURTHER ORDERED** that because this Order is agreed by the Parties and because Plaintiffs have already posted bond in the amount of $1,730.91, this Order shall be effective immediately without the need for Plaintiffs to post any further bond or security.

14. **IT IS FURTHER ORDERED** that nothing contained herein limits or waives any cause of action, counterclaim, or affirmative defense that the parties have alleged or may allege in this litigation.

_____
U.S. District Judge Jennifer A. Dorsey
Dated: March 7, 2019